**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

Civil Action No. 18-cv-00329-MSK-STV

JUAN VALENZUELA,

     Plaintiff,

v.

KARL COLEMAN,
LIGEIA CRAVEN,
ANTHONY WILKERSON,
JAMES HAROLD GAVIN, JR.,
JOSEPH CHACON, JR., and
THE CITY AND COUNTY OF DENVER, COLORADO,

     Defendants.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**MOTIONS FOR SUMMARY JUDGMENT**

---

     **THIS MATTER** comes before the Court pursuant to Defendants' motion for summary judgment (**# 70**); the Plaintiff's (**# 87**); and the Defendants' reply (**# 94** ).  Also pending are two motions, one filed by the Plaintiff and one filed by the Defendants, seeking to exclude testimony from witnesses proffered by the other side pursuant to Fed. R. Evid. 702 (**# 71 and # 72**), and two motions to restrict access to certain summary judgment exhibits (**# 73 and # 91**).

## I.  JURISDICTION

The Court exercises jurisdiction under 28 U.S.C. § 1331.

## II.  FACTS

     The pertinent facts in this action are relatively straightforward and disputed only in degree, not in nature. On February 15, 2017 at approximately 6:00 a.m., Mr. Valenzuela

approached a Transportation Security Administration ("TSA") security checkpoint located in Concourse A at the Denver International Airport ("DIA") prior to departing on a scheduled flight.   Mr. Valenzuela had been issued a valid driver's license from the State of California, but that license had allegedly been confiscated during a traffic stop some months earlier and never returned.  Thus Mr. Valenzuela produced an expired California ID card to establish his identity. It is undisputed that the ID card Mr. Valenzuela produced was perceptibly damaged – it was warped, displayed unusual bulges, and portions of the lamination were cracked or broken.  Even Mr. Valenzuela harbored a concern that authorities might not accept the ID card.

Mr. Valenzuela initially presented the ID card to TSA Officer Rebecca Peterson.  She examined it and believed that it might have been altered or cut in some way.  She summoned her supervisor, TSA Officer Clarissa Wright, and over the next few minutes, Ms. Wright and several other TSA Officers examined the ID card and asked Mr. Valenzuela various questions about the damage to the card (which Mr. Valenzuela attributed to the card accidentally going through a washer and dryer on several occasions), about other forms of ID he might have, why he had no Colorado ID card despite having resided in Colorado for more than a year, among other matters. Each of the TSA officers was concerned that proffered ID card had been altered, but their observations differed – some believed that someone had "used an exacto knife to cut around his picture and cut through the laminate to alter his ID", others said it felt like a "staple" was embedded in the card near the bar code, among other tactile defects.  It is not clear whether the TSA officers examined the card's security features, such as an embedded hologram recreation of the photo or printing visible under UV light, but it appears to be largely (although not entirely, as discussed below) undisputed that those security features were intact and consistent with the photograph shown on the card.

A TSA supervisor then took the ID card to Denver Police Officer Dan Dietz, who was stationed at the DIA checkpoint to provide police support to TSA officials.  Officer Dietz examined the ID card, and observed that "it appeared that it was thick around the picture of the ID with lamination over [it]" and that there "was a pronounced bump that was around the picture."  Officer Dietz thought "it was suspicious as far as maybe someone replaced the picture because it felt like that was too thick compared to the rest of the ID."  Because the police staff at DIA lack the ability to do direct records checks, Officer Dietz attempted to place a phone call to the National Crime Information Center ("NCIC") to investigate further, but it was too early in the morning and he did not receive any answer.

Officer Dietz then summoned a superior.  Denver Police Corporal Anthony Wilkerson arrived, along with Denver Police Officer Ligeia Craven.  Officer Craven was advised of the situation by a TSA officer, asked a few questions of Mr. Valenzuela, and then examined the ID for two to three minutes.  She observed that it "was wrinkled, bent up"; that "the picture in itself was as if it was, you know, pasted in there and it was pushed back"; that "it was like a couple different levels, because when you feel the top of it, it's not smooth going across"; and that "one of the corners the barcode had what felt like a staple in the side, on the backside of it[,] it did not feel like a smooth surface."  Believing that the ID card "felt to me to be a fraud," Officer Craven advised Mr. Valenzuela of his *Miranda* rights, and Mr. Valenzuela agreed to answer her questions.[1]  She then asked him about his employment – Mr. Valenzuela was employed by a

---

[1]      Officer Craven testified that Mr. Valenzuela was no longer free to leave as of this point in time, suggesting that he had been arrested as of this point in the narrative.  However, the actual sequence of events is somewhat jumbled in all of the officers' deposition testimonies and it is possible that this arrest did not occur until Mr. Valenzuela was taken to a holding cell sometime later.

privately-operated prison facility.  At Mr. Valenzuela's suggestion, she placed a telephone call to

Mr. Valenzuela's supervisor, who confirmed that Mr. Valenzuela was employed by the prison.[2]

Officer Craven then presented the ID card to Corporal Wilkerson, along with her opinion that it

was "fake."  Corporal Wilkerson "glanced" at the ID "for less than 15 seconds" and observed

that "it looked kind of recessed around the picture and it looked like . . . somebody had placed

that picture on top of the ID card."[3]  He concurred with Officer Craven's assessment that "it did

not appear to be legitimate."  Corporal Wilkerson, Officer Craven, and Officer Karl Coleman,

who was also on the scene, agreed that Mr. Valenzuela should be detained pending further

investigation.  They handcuffed Mr. Valenzuela and escorted him to a nearby office area and

placed him in a holding cell.

By this time, Officer Coleman had contacted NCIC and learned that Mr. Valenzuela had

a valid California driver's license, but there was no record of the expired ID card.  However, the

NCIC record revealed that the California driver's license bore the same identification number as

the ID card, a situation that Officer Coleman considered "odd."[4]  Officer Coleman and Corporal

---

[2]      Officer Craven testified that the supervisor advised her that Mr. Valenzuela had to possess a valid <u>Colorado</u> driver's license in order to work at the prison.  Around the time that she was speaking with the supervisor, other offices had contacted the NCIC and determined that Mr. Valenzuela did not possess any Colorado license.  It is not clear whether any officer followed-up on this apparent discrepancy.

      Mr. Valenzuela either disputes that the supervisor stated that a Colorado license (as opposed to a valid license from any state) was required, or states that the supervisor was simply in error.  It is not necessary to resolve this discrepancy, and the Court will assume that Officer Craven was advised that Mr. Valenzuela's job required him to possess a Colorado driver's license and that it is undisputed he did not have one.

[3]      Mr. Wilkerson testified that he did not actually handle the card and conducted only a visual examination.

[4]      In certain states, including California, document identification numbers are unique to an individual, not a document.  Thus, an ID card issued to that individual would bear the same identification number as a driver's license that was issued subsequently.  This would appear to

Wilkerson decided to consult with Denver Police Detective James Gavin, who "looked at the ID and gave [his] opinion" about it as well.  There is some dispute among the officers as to who made the decision, but a decision was made to charge Mr. Valenzuela with felony forgery.  No officer specifically identified any feature of the ID card that had been actually altered, although most shared the opinion that irregularities with the "feel" around the photograph area raised suspicions that the original photograph might have been removed and replaced somehow.

Officer Coleman drafted the following probable cause statement:

> That on 02-15-2017 at approximately 5:55 a.m. the aforementioned defendant – Juan Daniel Valenzuela – did knowingly and willfully violate CRS 18-5-102(e) Forgery of a Government Document in that: he did attempt to access A Concourse through TSA A Screening checkpoint at DIA at 8500 Pena Blvd Denver, CO 80249 to catch a Spirit Airlines flight using a forged CA ID (CAID # D8674853) as his government identification.
>
> The above statement is true and believable based upon the personal knowledge and observations of TSA officer Rebecca Peterson and the investigations of Ofc Craven and Cpl Wilkerson.

Mr. Valenzuela was transported to the Denver Detention Center and detained for two days.  On February 17, 2017, the District Attorney charged Mr. Valenzuela with forgery.  Based solely on the contents of Officer Coleman's probable cause statement, a trial court judge found probable cause to exist and directed that Mr. Valenzuela be detained until he could post bond, which he did shortly thereafter.  In the interim, because of his arrest and pending charges, it appears that Mr. Valenzuela was fired from his job at the prison.  By May 24, 2017, the District

---

explain why the NCIC check revealed a California driver's license for Mr. Valenzuela bearing the same document number as the ID card he proffered.  And one can reasonably assume that California records may have superseded any indication of the existence of the ID card once the driver's license was issued.  Each of the officers who testified denied having any knowledge of such a practice.

Attorney had determined that Mr. Valenzuela's ID card was not forged and two days later, the District Attorney moved to dismiss the charge, which motion was granted.

Mr. Valenzuela then commenced this action, asserting the following claims, all pursuant to 42 U.S.C. § 1983: (1) a claim for unlawful arrest and detention (akin to the tort of false arrest) in violation of the Fourth Amendment, against Officers Coleman, Craven, Gavin, Corporal Wilkerson, and Denver Police Sergeant Joseph Chacon, who allegedly supervises the other police officer defendants, based on either direct participation in the deprivation or a failure to supervise; (2) what appears to be a second claim against Officer Coleman, in that Officer Coleman's omissions of "exculpatory evidence" – namely, evidence that data on Mr. Valenzuela's ID card and other information obtained by the officers partially confirmed that he was who he claimed to be -- from the probable cause statement unreasonably prolonged Mr. Valenzuela's detention in violation of the Fourth Amendment (a claim akin to the tort of malicious prosecution); (3) a *Monell* claim against the City and County of Denver ("Denver"), alleging that Denver failed to adequately train and supervise officers regarding investigations of false/fraudulent identification cards, leading to a high likelihood of Fourth Amendment violations; and (4) a *Monell* claim against Denver, alleging that Denver failed to adequately train and supervised officers regarding the appropriate completion of probable cause statements.

The individual officers move for summary judgment on Mr. Valenzuela's Fourth Amendment claim for unlawful arrest and assert the doctrine of qualified immunity. Denver moves for summary judgment on Mr. Valenzuela's *Monell* claims, arguing that he cannot establish the required *prima facie* elements.

### III.  LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  Because of the underlying purposes of qualified immunity, the Court treats qualified-immunity questions differently from other questions on summary judgment.  *See Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010).  After a defendant asserts qualified immunity, the burden shifts to the plaintiff, who must: (1) show facts that "make out a violation of a constitutional right," and (2) establish that, at the time of the conduct at issue, it was clearly established under existing law that the defendant's conduct breached the constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The Court may address these questions in whichever order is best suited to the case.  If the plaintiff fails to satisfy either prong of this inquiry, the Court "must grant the defendant qualified immunity."  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001).  However, if the plaintiff establishes the violation of a clearly established right, it becomes the defendant's burden to prove there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law.  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

For all practical purposes, the question of whether the evidence shows a violation of a constitutional right is indistinguishable from the inquiry that the Court would make in determining whether the plaintiff has come forward with sufficient evidence to establish a *prima facie* claim in accordance with Rule 56. The plaintiff must produce sufficient evidence, which if true, would make a *prima facie* showing of a cognizable claim. The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to demonstrate the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The "clearly established" inquiry focuses on whether the contours of the constitutional right were so well-settled in the context of the particular circumstances, that a "reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). To satisfy this prong, the burden is on the plaintiff to point to Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented. *Schwartz v. Booker*, 702 F.3d 573, 587–88 (10th Cir. 2012); *see also Thomas*, 607 F.3d at 669 (plaintiff bears the burden of citing to requisite authority). It is not necessary for the plaintiff to point to a case with identical facts, but he must identify some authority that considers the issue "not as a broad general proposition," but in a "particularized" sense — for example, it is not sufficient to ask whether it is "clearly established" that the Fourth Amendment prohibits the use of excessive force in effecting an arrest; rather, the court examines whether that constitutional principle has previously been found to prohibit particular conduct. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 198–200 (2004).

## IV.  DISCUSSION

### A.  Claims against individual officers

With these legal standards in mind, the Court turns to Mr. Valenzuela's claims against the officers – that the arrest was unlawful because the officers lacked probable cause to believe that he had committed a crime. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures … shall not be violated." U.S. Const. Amend. IV. A "seizure" for the purposes of the Fourth Amendment occurs when a government actor terminates one's "freedom of movement through means intentionally applied." *See Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Dist. of Columbia v. Wesby,* 138 S.Ct. 577, 585-86 (2018). There is no dispute that Mr. Valenzuela was subjected to a seizure for Fourth Amendment purposes, as he was detained and arrested as a result of the officers' belief that the ID card he had presented was a forgery. C.R.S. §18-5-102(e)(2) states that a forgery occurs when a person, "with intent to defraud," "falsely makes, completes, alters, or utters a written instrument which is or purports to be…..(e) a written instrument officially issued or created by a public office, public servant, or government agency." An instrument is "uttered" when a person offers a forged item to another with knowledge of its falsity and with an intent to defraud. *Id.*, *see Pollock v. People*, 443 P.2d 738, 739 (Colo. 1968).

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008). Here, the central question is whether the officers had probable cause to believe that Mr. Valenzuela had committed the crime of forgery -- by presenting an ID card that he knew had been altered to the TSA with the intent to deceive TSA.

The parties devote considerable argument as to whether the individual officers' observations regarding the tactile and other defects in Mr. Valenzuela's ID card suffice to support a reasonable inference that Mr. Valenzuela had knowingly altered the ID, but the Court need not reach that question in order to resolve the Defendants' motion. For purposes of this Order, the Court will assume that Mr. Valenzuela has demonstrated a triable issue of fact as to as to the reasonableness of the Defendants' belief that the ID card had been altered. But that is all.

None of the officers focused on the purpose of the card – to establish identity – or whether it was altered in a way to misrepresent Mr. Valenzuela's identity. Because the crime of forgery requires proof that Mr. Valenzuela uttered the card with the specific intent to deceive, it is important to consider the purpose for which Mr. Valenzuela presented the card to TSA officials: to establish his identity. Thus, it would seem that, to constitute the crime of forgery, Mr. Valenzuela must have altered the card in a way that changed the identity features on the card (*i.e.* changing a card issued to someone else to appear that it was issued to Mr. Valenzuela), and that Mr. Valenzuela proffered the card to establish his identity even though he knew that it had been altered.

The beliefs of the officers as to alteration are insufficient to satisfy probable cause as to Mr. Valenzuela's knowledge or intent. First, it is fair to say that all of the officers found the card to be damaged and warped, but they did not agree on the nature of the alteration. Some suspected the photograph on the card might have been changed, others thought a foreign object, such as a staple, was embedded in the card. Second, they did not go beyond the suspicion that the card had been altered to form a reasonable belief that it had been altered with regard to Mr. Valenzuela's identity. Indeed, it is undisputed that every effort to corroborate the identity information on the card – by comparing it with Mr. Valenzuela's other identification or with information found in

11

the NCIC database – suggested that Mr. Valenzuela was indeed who he purported to be.  There is no evidence in the record suggesting that the card was issued to any person other than Mr. Valenzuela.  If the card did not misrepresent Mr. Valenzuela's identity, it was not false and he could not have proffered it with an intent to deceive.  Put another way, why would Mr. Valenzuela would alter an ID card that had already been issued to him and which contained entirely correct identifying information about him?  In short, the officers stopped at the first level of inquiry – was the Identification Card altered? – and failed to form a reasonable belief that it had been altered in a way that affected the identity of the person represented on it and that Mr. Valenzuela had proffered it to establish his identity when it had been issued to another person. Without a probable cause showing as to all elements of the charge brought against Mr. Valenzuela (or any other crime for which he was arrested but not charged), a jury could reasonably find a 4th Amendment violation.

Despite this showing, however, to defeat the officers' invocation of the defense of qualified immunity, Mr. Valenzuela must also show that the law was "clearly established" in 2017 that the officers' conduct in this case would be unconstitutional. *Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020).  To do so, Mr. Valenzuela must point to "a factually similar Supreme Court or published Tenth Circuit decision" (or by demonstrating "the clearly established weight of authority from other courts") in existence at the time of the conduct that recognizes it as unconstitutional.  *Brown v. Flowers*, ___ F.3d ___, 2020 WL 5509683 (10th Cir. Sept. 14, 2020), *citing Perry v. Durborow,* 892 F.3d 1116, 1123 (10th Cir. 2018).  The supporting case need not be "directly on point," but at the same time, it is not sufficient to cite to cases that, for example, recognize Fourth Amendment rights at "a high level of generality." What is necessary is a caselaw that is sufficiently similar to the facts involving Mr. Valenzuela that a

reasonable police officer, aware of the existing precedent, would understand that what he or she was doing in Mr. Valenzuela's case would violate the rights recognized in the earlier case.  *Id.*

Mr. Valenzuela has not carried this burden.  Rather than attempting to point to a sufficiently-analogous case, Mr. Valenzuela instead rejects the fundamental principles of the "clearly established" adopted in this circuit.  He argues that he is not required to "find another unlawful arrest case with the same facts as this one in order to overcome qualified immunity," and that the Court should simply "ask[ ] whether there was arguable probable cause for the challenged conduct."  But in his argument, Mr. Valenzuela ignores the well-settled caselaw, such as *Brown*, requiring him to show not only a *prima facie* violation of 4th Amendment violation but also that some precedent recognizes the unconstitutional character of the conduct.

There is no doubt that probable cause is required for a lawful arrest, and in the context of a criminal case, an absence of probable cause might result in suppression of evidence obtained as a result of the arrest.  But this is not a criminal case, and it is insufficient to rely on general statements of the law to hold individual officers individually liable for unconstitutional conduct.  As noted in *Brown*, to impose individual liability on officers for a constitutional violation requires identification of precedent that if know to a reasonable officer would be sufficient to alert the officer that such conduct was unconstitutional.  Mr. Valenzuela offers no caselaw that purports to establish a Fourth Amendment violation based on facts similar to those presented here – an individual is arrested on charges of forgery after presenting a visibly-damaged identification document (such as a driver's license, ID card, or passport) that police believe has been altered based upon cursory inspection,  but without any specific evidence that the alteration affects the representation of identity.  The Court has conducted its own independent research to determine whether such caselaw exists, but has found none.  Furthermore, the Court is

unpersuaded that the facts reflected in this record are so "obviously egregious" that any reasonable person would understand the officers' conduct to be unconstitutional.  *Citing Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).  Rather, this is precisely the sort of case where the particular factual scenario is important in defining the boundaries of what constitutes reasonable police conduct, such that a factually-similar case is necessary to clearly establish the existence of constitutional liability.

Accordingly, the Court finds that the individual officers are entitled to qualified immunity and judgment in their favor on the claims against them.[5]

**B.  Claim against Officer Coleman**

Separately, Mr. Valenzuela alleges that Officer Coleman violated his Fourth Amendment rights by preparing a probable cause statement that omitted relevant information that, if disclosed, would have revealed that probable cause for Mr. Valenzuela's arrest and detention was lacking.  Claims of this type are generally analogized to common-law malicious prosecution claims, requiring Mr. Valenzuela to show that: (i) through a misstatement or omission, Officer Coleman caused Mr. Valenzuela's continued confinement or prosecution; (ii) that prosecution terminated in Mr. Valenzuela's favor; (iii) no probable cause supported the original arrest or continuing prosecution; (iv) Officer Coleman acted with malice; and (v) Mr. Valenzuela sustained injuries as a result.  *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

---

[5]      The same logic disposes of Mr. Valenzuela's false arrest-style claims against Corporal Wilkerson, Officer Gavin, and Mr. Chacon.  These defendants are named under a "failure to supervise" theory, in that they failed to adequately supervise officers like Officer Coleman who decided to bring forgery charges based on the facts at hand.  Assuming, without necessarily finding, that Mr. Valenzuela has demonstrated a triable question as to whether these officers' conduct suffices to establish a colorable claim for failure to supervise, Mr. Valenzuela is still required to satisfy the "clearly established' prong on the failure to supervise claim as well.  *See e.g. Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1241 (10th Cir. 1999).

Mr. Valenzuela identifies several facts that, he contends, Officer Coleman was obligated to include in the probable cause statement in order to prevent that statement from being misleading: (i) the fact that the photograph in the ID was not identified as being false; (ii) that the photograph of Mr. Valenzuela on the card matched the security hologram on the card; (iii) that the other security features on the card were intact; (iv) that the NCIC and California DMV confirmed a "hit" based on the card number; (v) that the NCIC and other records confirmed the biographical and address data on the ID card; (vi) that Mr. Valenzuela had other forms of identification that confirmed his identity; and (vii) that officers contacted a supervisor at Mr. Valenzuela's work who confirmed his employment status.  Thus, to establish the first element of the claim, Mr. Valenzuela must show that, had Officer Coleman included one or more of these allegedly-exculpatory facts in his probable cause statement, the trial court would have found no probable cause for Mr. Valenzuela's continued confinement.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) ("the existence of probable cause is determined by examining the evidence as if the omitted information had been included and inquiring whether probable cause existed in light of all the evidence, including the omitted information).

This Court finds that there is a triable issue of fact as to whether probable cause would have existed had Officer Coleman disclosed one or more of the omitted facts listed above as part of his probable cause statement.  This conclusion is largely driven by the fact that Officer Coleman's probable cause statement in its <u>original</u> form lacked any facts to demonstrate sufficient probable cause to support a charge of forgery.  Officer Coleman's statement is entirely conclusory: it merely stated that Mr. Valenzuela "us[ed] a forged CA ID." It does not describe the condition of the ID card, specify how it was allegedly altered, relate any facts that police officers relied upon in deciding that the card was altered, or disclose any other information that

15

would have allowed a neutral and detached court to determine that Mr. Valenzuela had indeed

committed the crime of forgery (including the *mens rea* element).[6]  Because the probable cause

statement was insufficiently specific to establish probable cause in and of itself, the question of

whether additional "exculpatory" evidence would have vitiated probable cause is largely

academic.  Thus, Mr. Valenzuela has stated a colorable Fourth Amendment malicious

prosecution-type claim against Officer Coleman.

      Officer Coleman also argues that Mr. Valenzuela cannot establish that he acted with the

requisite state of mind, namely, malice.  In a malicious prosecution-type action, malice may be

inferred if the defendant "causes the prosecution without arguable probable cause."  *Stonecipher

v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014).  As noted above, there is sufficient evidence to

present a triable question of fact as to whether Officer Coleman – or any of the defendant

officers – had probable cause to believe that Mr. Valenzuela's ID card had been deliberately

altered.  No officer ever identified anything more than a suspicion that the card had been altered

in some often-undefined way.  Of the officers who engaged in anything more than a cursory

review of the ID card – *i.e.* Officer Dietz and Officer Craven – both testified the card looked or

felt like the photo might have been cut out and replaced, but neither officer testified that they

inspected the card further to verify that the photo portion was detached from the rest of the card

or investigated the security features that exist to indicate whether a photo had been replaced.  In

---

[6]    The fact that the trial court accepted Officer Coleman's conclusory statement and found probable cause to exist to detain Mr. Valenzuela does not insulate Officer Coleman from liability for having tendered a patently-deficient probable cause statement for the court to (mistakenly) rely upon.  *Robinson v. Maruffi*, 895 F.2d 649, 656 (10th Cir. 1990) (police officers "cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute a defendant. They cannot hide behind the officials whom they have defrauded").

such circumstances, there is at least a genuine dispute of fact as to whether any officer had probable cause to believe that the document had been deliberately altered in any way.  For the same reasons, there is a triable issue of fact as to whether an inference of malice can be drawn from Officer Coleman's decision to charge Mr. Valenzuela with fraud despite lacking probable cause to do so.

The remaining question is whether the contours of Mr. Valenzuela's claim against Officer Coleman were "clearly established" as unconstitutional as of 2017.  Again, Mr. Valenzuela has not identified any specific case that recognizes the existence of a constitutional claim in similar factual circumstances, but the Court agrees with him that, with regard to this claim, Officer Coleman's conduct is so fundamentally inconsistent with the Fourth Amendment's "probable cause" requirement that no corresponding caselaw is necessary.  It is axiomatic that an arrest and the initiation of a prosecution must be supported by probable cause. The 10th Circuit has recognized that a person who causes the initiation or continuation of a prosecution by means of a statement that (whether organically or through misrepresentations of omissions) fails to provide sufficient probable cause for such prosecution can be held liable under § 1983.  *Pierce*, 359 F.3d at 1292.  Officer Coleman's probable cause statement is inherently insufficient to establish probable cause on the issue of whether Mr. Valenzuela's tendered ID card was forged because it contains no facts whatsoever addressing alteration in any way.  For all practical purposes, Officer Coleman's statement regarding the existence of a forged instrument was nothing more than "trust me, it was."  Even in the absence of on-point caselaw, no reasonable police officer would believe that a completely conclusory statement charging a defendant with a crime would suffice to establish probable cause, and thus, the Court finds that

Mr. Valenzuela's malicious prosecution-style § 1983 claim against Officer Coleman arising from the defects in Officer Coleman's probable cause statement may proceed to trial.

### C. *Monell* claims against Denver

Finally, Mr. Valenzuela alleges that Denver's own customs and policies resulted in a failure to train or a failure to supervise its police officers regarding the evaluation of ID cards and the preparation of probable cause statements, leading to unconstitutional actions such as the one suffered by Mr. Valenzuela here.

To establish a *Monell* claim for municipal liability, Mr. Valenzuela must show: (i) an official policy or custom by Denver relating to the training or supervision of police officers; (ii) that the challenged policy or custom – and not the actions of an individual or group of employees -- was "the moving force" behind the constitutional deprivation that Mr. Valenzuela suffered; and (iii) that Denver had actual or constructive notice that its actions or failures were substantially certain to result in constitutional violations, but that it consciously and deliberately chose to disregard that risk – an element typically proven by showing either a pattern of unconstitutional conduct by officers or by a showing that a constitutional deprivation is a "highly predictable or plainly obvious consequence" of Denver's policies or customs. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769-70 (10th Cir. 2013).

The parties agree that section 303.15 of the Denver Police Department Operations Manual constitutes the primary policy that Denver maintains regarding false identification. That policy provides that police officers "shall make every attempt to establish if the ID is legitimate" before taking any action. It instructs that suspicious ID cards should be "transported to headquarters [ ] for verification" during normal business hours. Outside of normal business

hours, "a night-shift detective or an Identification Bureau technician shall review the ID for legitimacy."

John Coppedge, Denver's designated representative who testified about Denver's police training, testified that the first step of this policy requires officers to "assess the ID," meaning "Look, feel, touch . . . what does the ID appear, does it appear to have been manipulated, does it appear to have been forged?"  He acknowledged that Denver does not provide officers with a checklist or other guidance in performing this assessment, instead stating that an officer's evaluation is "more based on common sense."  Mr. Coppedge testified that "if something doesn't feel right, doesn't look right, you need to dig, see if you can verify <u>that this person is who they're presenting themselves to be.</u>"  (Emphasis added.)  Once again, no particular guidance is provided to officers.  Instead, they are "trained to critically think and analyze the situation, so it's taking in information from whatever resource you can access to make that assessment," although he suggests that officers evaluate "who issued the ID, where did the ID come from, is there a record of that ID within that jurisdiction."

Having identified Denver's policy governing the investigation of ID cards, the next question is whether the policy itself was the "moving force" behind a violation of Mr. Valenzuela's constitutional rights.  The Supreme Court discussed the "moving force" element in *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997).  *Brown* differentiated between two scenarios: one where "a particular municipal action <u>itself</u> violates federal law or directs an employee to do so" and one where the municipality engaged in a lawful action that did not directly injure the plaintiff but "nonetheless caused an employee to do so."  In the latter case – which is what is presented here – "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."

As the Court explained "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the <u>employee</u> acted culpably."  The Court acknowledged that an allegation of "inadequate training" "could be the basis for § 1983 liability in limited circumstances," but emphasized that such claims typically will require proof of "the existence of a pattern of tortious conduct by inadequately trained employees . . ., rather than a one-time negligent administration of the [policy] peculiar to the officer[s] involved in a particular incident."  But it also acknowledged the possibility that a plaintiff could show "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation."  502 U.S. at 404-409.

Mr. Valenzuela's claim against Denver invokes such a "failure to train" concept. Because Mr. Valenzuela does not purport to identify multiple instances of these or other Denver police officers violating the Fourth Amendment rights of individuals with damaged ID cards, Mr. Valenzuela is left to proceed under the theory that the incident involving him was a "recurring situation[ ] presenting an obvious potential for such a violation."

In broad terms, it is true that officers staffing an airport security checkpoint will face the recurring situation of being asked to assess the validity of an individual's ID documents, and if improperly-handled by officers, such situations could present the likelihood of a constitutional violation.  But Mr. Valenzuela's *Monell* claim against Denver for failure to train officers in the evaluation of ID cards fails because the record reflects that the officers <u>knew</u> of the correct process to follow, but nevertheless failed to follow it.  In other words, the cause of Mr. Valenzuela's constitutional deprivation was not a defect in the policy itself, but a defect in how

the individual officers carried that policy out.  To repeat, Denver's policy essentially calls for officers to perform three steps: (i) examine the ID document and determine whether, based on its look and feel, it is genuine or altered; (ii) if the officer remains suspicious, the officer should "dig" for more information, using available resources to determine whether the ID is authentic; and (iii) if questions remain, the ID (and the suspect) should be produced to designated individuals within the police department for final evaluation.  There is no dispute among the parties that each officer examined the look and feel of Mr. Valenzuela's ID card and deemed it suspicious –indeed, Mr. Valenzuela concedes that the card was misshapen and irregular.

As to the next step, availing themselves of alternative sources of information to compare to the proffered ID, the major participants in the examination of Mr. Valenzuela's ID card and the decision to charge him criminally – Officer Coleman and Officer Craven – both testified to understanding what this step of the policy entailed.  Officer Craven testified that she "would also look at [irregularities] a little further and deeper to see if that's actually legit or not, if it all matches," using steps such as matching signatures between the ID and exemplars and confirming "the description, the address, the numbers, the dates, the expiration, stuff like that."  Officer Coleman testified that, after examining the ID and concluding it was suspicious, he "got on the computer and got on NCIC," the only database he was permitted to access.  He also examined some of the security features on the card to attempt to confirm whether the photo had been altered (although not all of them).  Even Detective Gavin, ostensibly a detective that could make a final call on the validity of the ID card according to Section 300.15, testified that she was aware of the existence of Denver's policy, although he could not remember what the policy required and chose not to look it up.  Detective Gavin conceded at his deposition that "I don't know if I conformed my behavior to the policy."  Thus, the record reflects that these officers

knew what they were supposed to do to attempt to verify the validity of the ID, but they simply went about it in an incomplete or careless way.

Officer Craven acknowledged that there were several steps that she could have taken to verify that Mr. Valenzuela was who he claimed to be – that is, ways in which she could "dig" for additional proof that would either confirm that Mr. Valenzuela was who he claimed to be or not -- but that she did not take those steps.  Officer Craven did not attempt to compare the photograph on the card with the security hologram, did not request that the NCIC retrieve a known photo of Mr. Valenzuela to compare him to, did not seek to take fingerprints to verify his identity, did not check with the California DMV or any other database or source to attempt to verify any matters about the ID card, and did not attempt to obtain exemplars of California ID cards to compare with Mr. Valenzuela's.  She acknowledged that if a proffered ID has a signature on it, "you can see if that signature matches any of their information or if they've signed anything or if they have anything on that that could possibly, you know, match the IDs to their signature."  Docket #87-6 contains a photograph of Mr. Valenzuela's ID card, which appears to include a signature element, but nothing in the record indicates that Officer Craven or any other officer attempted to compare that signature with any other exemplar of Mr. Valenzuela's signature.  Had Officer Craven fully complied with the requirements of Section 300.15 – had she "dug" as deeply as Denver trained her to do – she could have unearthed evidence that confirmed that Mr. Valenzuela was indeed the person depicted on the ID card and that the ID card had not been altered.

Only after Mr. Valenzuela had already been arreste, did Officer Coleman contact the NCIC, finding that Mr. Valenzuela had been issued a California Driver's License under the same document number as the ID card he had proffered.  Although Officer Coleman found this

situation "odd," he did no further digging on that subject.  Officer Coleman also testified that he examined the security hologram on the ID card and decided that the hologram version of the photo and the photo itself "didn't look anything alike."  Once again, docket #87-6 contains photographs of the ID card that depict the photo, a visible miniature image of the photograph, and a security hologram of the photo that appears only under UV light.  The Court finds that the three versions of the photograph are sufficiently visually-similar that a jury should be permitted to evaluate the reasonableness of Officer Coleman's conclusion on this point.  Officer Coleman testified that he did not examine any other security features on the card.

Detective Gavin also conceded that he did not perform several actions that could have assisted in ascertaining Mr. Valenzuela's identity.  He acknowledged that, after receiving the NCIC report, he compared certain reported information obtained from the California DMV regarding Mr. Valenzuela's missing driver's license with the information shown on the proffered ID card, observing that the name, date of birth, driver's license number, height, eye color, and hair color reported by California matched the data on the ID card.  (Detective Gavin states that the weight data did not match, but did not testify as to the extent of any discrepancy.)  He did not contact the California DMV to inquire about the discrepancy between the ID card and reported driver's license, nor did he contact any other databases or other sources of information before concluding that the ID card had been forged.

Thus, the record reflects that none of the key officers engaged in the sort of "digging" that they knew they were supposed to undertake.  The Denver policy focuses on affirmatively identifying the person proffering the ID for an obvious reason: there are few circumstances where a person will alter and then attempt to utter an identification card that otherwise properly

identifies them.[7]  Ultimately, that is where the officers here departed from Denver's stated policy: instead of focusing on identifying Mr. Valenzuela, and then asking themselves why he would have sought to alter the photograph of himself on an ID card that otherwise indisputably belonged to and described him, the defendant officers effectively stopped after the first step, deciding that because the ID card looked and felt altered, it must have been altered, and implicitly the alteration must have been as to Mr. Valenzuela's identity.  Because the constitutional deprivation in this case was not caused by Denver's policy, but by the improper execution of that policy by officers who knew how they should have applied it, Mr. Valenzuela's *Monell* claim against Denver fails at the causation stage.

Mr. Valenzuela's second *Monell* claim against Denver is that Denver failed to adequately train officers like Officer Coleman to include known exculpatory evidence in probable cause statements.  The Court need not explore this claim in great detail because it is apparent that any defects in Denver's training of police officers as it relates to the exclusion of exculpatory evidence in a probable cause statement was not the cause of Officer Coleman arguably violating Mr. Valenzuela's constitutional rights.  According to Officer Coleman's belief, Mr. Valenzuela's ID card was altered by replacement of the original photograph with a different one.  The fact that the remaining information on the ID card conformed to information contained in NCIC and other databases would not be exculpatory information because Officer Coleman was not contending that Mr. Valenzuela altered those parts of the ID card, just the photo.  Thus, even proper training

---

[7]      The primary exception to this observation might be a minor who alters his or her own identification card in order to misrepresent his or her date of birth, attempting to appear older than they actually are.  But Mr. Valenzuela was 30 years old at the time of the incident and no officer believed that the date of birth on his ID card was altered.  Indeed, Detective Gavin noted that that date of birth on the ID card matched that on file with the California DMV.

of Officer Coleman would not have resulted in that information being disclosed in the probable

cause statement.

 The only arguably "exculpatory" evidence that would relate to the alleged replacement of

the photograph would be if security features relating to that photograph were nevertheless

consistent with the photograph actually shown on the ID card.  But Officer Coleman testified

that, in his opinion, the photograph on the card did <u>not</u> match the security features relating to the

photograph.  Officer Coleman testified that he examined "a little picture at the bottom right-hand

portion . . . that's kind of a holographic image of what the main picture would look like" and

decided that "it didn't look anything like [the main photograph].  The one that he had pasted on

there was all smeared, like erased or something."  Thus, as far as Officer Coleman was

concerned, there was no exculpatory evidence that suggested that, contrary to the probable cause

statement, the ID card had <u>not</u> been altered.  Thus, even if Mr. Valenzuela is correct in that

Denver's training of officers regarding the inclusion of exculpatory facts in probable cause

statements is defective, that defect was not the cause of Officer Coleman's insufficient probable

cause statement.  Rather, the insufficiency of the probable cause statement occurred because

Officer Coleman (and the other officers) failed to conduct a sufficient examination of the ID card

before concluding that it had been forged and that the forgery pertained to Mr. Valenzuela's

identity.[8]

---

[8] Mr. Valenzuela also appears to allege more generally that Denver failed to train officers
to provide sufficient information generally in probable cause statements.  During his deposition,
Officer Coleman appeared to be uncertain about precisely what he was trained to include in such
statements, apparently believing that it involved an acronym of LEVIT or the like that required
"location, action name" and perhaps other information.  Mr. Coppedge testified that officers are
trained to "put in the facts of the case relevant to the elements of the crime that is being alleged."
Assuming that Officer Coleman lacked a proper understanding of how to complete a probable
cause statement, this appears to be an instance of a single individual officer failing to understand

Thus, Denver is entitled to summary judgment on Mr. Valenzuela's *Monell* claims.

### D.  Rule 702 Motions to Exclude Evidence

Both sides have designated various witnesses to provide opinion testimony at trial pursuant to Fed. R. Evid. 702.  Each side has filed a motion seeking to exclude some or all of the designated witnesses' opinions.  However, given the Court grants summary judgment to the Defendants on all claims except Mr. Valenzuela's claim that Officer Coleman's probable cause statement lacked adequate factual support, the parties' proffered opinion testimony is no longer germane to the case.  Thus, both Rule 702 motions are denied as moot.

### E.  Motions to Restrict Access

Both sides move to restrict public access to several exhibits filed in support of the summary judgment briefing pursuant to D.C. Colo. L. Civ. R. 7.2.  "Courts have long recognized a common-law right of access to judicial records." *United States v. Bacon*, 950 F.3d 1286, 1292 (10th Cir. 2020) (citing *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012)). "Although this common law right is not absolute, there is a strong presumption in favor of public access.  However, this strong presumption of openness can "be overcome where countervailing interests heavily outweigh the public interests in access" to the judicial record. Thus, in exercising their discretion to restrict access to judicial records, courts must "weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." *Id.*

Additionally, Local Rule 7.2 requires a party seeking to restrict access to make several specific showings, including: (i) demonstrating why the private interest outweighs the public

---

Denver's training, not a systemic failure that would have put Denver on notice that its training was deficient.  Notably, Mr. Valenzuela has not identified any other individual who was detained as a result of a defective probable cause statement completed by Officer Coleman or any other officer.

one, (ii) identifying a "clearly defined and serious injury that would result if access is not restricted," and (iii) showing why alternatives to restriction, such as redaction or summarization, would not be effective in avoiding the need for outright restriction.  D.C. Colo. L. Civ. R. 7.2(c)(2)-(4).  With these principles in mind, the Court notes that the parties' motions seek to restrict the same exhibits filed in support of both the Defendants' Motion for Summary Judgment and the Plaintiff's Response.  Thus, the Court addresses the motions collectively.

Mr. Valenzuela moves (# 91) to restrict public access to five exhibits attached to the response to Defendants' motion for summary judgment.  The exhibits consist of (i) photographs of his driver's licenses and ID cards, (ii) his state DMV records including dossier information and driving record, and (iii) police officer NCIC/CCIC search information.  Defendants move (# 73) to restrict public access to photographs of the same forms of ID and a video of an individual viewing the ID card at various angles.  All of these exhibits contain Mr. Valenzuela's personal information such as his social security number, date of birth, personal identification numbers, biographical information, and addresses.

The Court grants the motions in part.  Some of the materials in question, such as Mr. Valenzuela's driving record and application for a driver's license and related documents, *e.g.* Docket # 89-1 at 5-17, are simply irrelevant to the issues before the court.  There is no particular public interest in having access to documents that are not relevant and thus were not considered by the Court.  *See Riker v. Federal Bureau of Prisons*, 315 Fed. Appx. 752, 754 (10th Cir. 2009).  Other materials disclose private identifying information regarding Mr. Valenzuela, such as his address and date of birth.  However, many of the documents sought to be restricted are photographs of various aspects of the ID card in question here, and because one of the central issues in this case involves the physical state and appearance of that item, the public has a

27

substantial interest in having access to those photographs.  (Moreover, the Court notes that Docket # 89-2, for which restriction is sought, appears to be identical to Docket # 87-6, which has been filed publicly and which is not the subject of any motion to restrict.)  The Court is mindful of Mr. Valenzuela's possible privacy interest in concealing his date of birth and address, both of which are prominently shown in each photo.  However, the record appears to suggest that the address shown on the card is no longer Mr. Valenzuela's current address, so he has a limited privacy interest in that address' disclosure.  That leaves only Mr. Valenzuela's date of birth, and although the Court finds that he has some privacy interest in concealing that fact, that interest fails to overcome the public interest in having access to a critical piece of evidence in this case.[9] Accordingly, the motions at Docket #89 and 91 are granted in part, insofar as the documents at Docket #89-1, 89-3, and 89-4 shall remain under a Level 1 restriction, and denied in part, insofar as the Clerk of the Court shall lift the provisional restrictions on Docket #89-2 and 89-5.

## V.  CONCLUSION

For the foregoing reasons,

1. Defendants' Motion for Summary Judgment **(# 70)** is **GRANTED IN PART**.  No party having requested issuance of a partial judgment under Fed. R. Civ. P. 54(b), at the conclusion of the remaining proceedings, judgment shall enter in favor of all Defendants except Officer Coleman, on all claims except Mr. Valenzuela's claim malicious prosecution-style claim under 42 U.S.C. § 1983.  The motion is **DENIED IN PART** insofar as the remaining claim against Officer Coleman will proceed to trial.

---

[9]     If the parties so desire, within 14 days of the date of this Order, they may file redacted versions of Docket #89-2 and 89-5 that redact only Mr. Valenzuela's date of birth, along with a renewed motion to substitute those redacted versions for the publicly-available ones.

2.  Defendants' Motion to Exclude Certain Expert Opinions of David D. Dusenbury (**# 71**) and Motion for Leave to Amend Dusenbury Declaration (**# 83**) are **DENIED AS MOOT**.

3.  Plaintiff's Motion to Exclude Certain Expert Opinions of DMV Investigator Scott Greminger (**# 72**) is **DENIED AS MOOT**.

4.  Plaintiff's Unopposed Motion to Restrict Access to Summary Judgment Exhibits (**# 91**) and Defendants' Unopposed Motion to Restrict Access to Unredacted Exhibit Attached to Motion for Summary Judgment (**# 73**) are **GRANTED IN PART** and **DENIED IN PART** as set forth above.  The Clerk of the Court shall lift the provisional restrictions on Docket #89-2 and 89-5.

Dated this 15th day of October, 2020.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge