**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 18-cv-00329-CMA-STV

JUAN VALENZUELA,

      Plaintiff,

v.

KARL COLEMAN,

      Defendant.

---

### ORDER ON POST TRIAL MOTIONS ## 149, 150, 151

---

This matter is before the Court on three post-trial motions: (1) Defendant's Renewed Motion Under Fed. R. Civ. P. 50(b) Or, In the Alternative, Motion for New Trial or Alteration or Amendment of the Judgment Under Fed. R. Civ. P. 59 (Doc. # 150); (2) Plaintiff's Motion for Attorney's Fees and Costs (Doc. # 149); and (3) Plaintiff's Motion for Prejudgment Interest (Doc. # 151). The Court addresses each motion in turn.

### I.     <u>PROCEDURAL BACKGROUND</u>

This case arises from an incident on February 15, 2017, when Plaintiff Juan Valenzuela attempted to board a flight at Denver International Airport. When asked to show identification at a screening checkpoint, Plaintiff produced an authentic, expired California ID card that was perceptibly damaged. TSA agents and Denver Police Department officials who examined the ID card believed the card might have been altered in some way. Eventually, Plaintiff was booked and detained. Defendant Karl

Coleman, a Denver police officer, drafted a probable cause statement ("PC Statement") that stated:

> The probable cause of the arrest of the above-named individual is as follows: [That on 02-15-2017 at approximately 5:55am the aforementioned defendant—Juan Daniel Valenzuela—did knowingly and willfully violate CRS 18-5-102(e) Forgery of a Government Document in that; he did attempt to access A Concourse through TSA A Screening checkpoint at DIA at 8500 Pena Blvd Denver, CO 80249 to catch a Spirit Airlines flight using a forged CA ID . . . as his government identification.
>
> The above statement is true and believable based upon the personal knowledge and observations of TSA officer Rebecca Peterson and the investigations of Ofc Craven and Cpl Wilkerson.]

(Doc. # 175-1.) Plaintiff was transported to the Denver Detention Center and appeared before a judge the next day, after which the district attorney charged Plaintiff with felony forgery. As a result, Plaintiff lost his job as a correctional officer. Three months later, the district attorney determined that Plaintiff's ID card was not forged and moved to dismiss the charges.

Plaintiff commenced this action on February 9, 2018. (Doc. # 1.) After a winnowing of claims and defendants, the case proceeded only on Plaintiff's malicious prosecution claim against Defendant Coleman pursuant to 42 U.S.C. § 1983.

The Court held a jury trial from February 28, 2022, to March 3, 2022. (Doc. ## 133, 134, 136, 138.) At the close of evidence, Defendant moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), which the Court denied. (Doc. # 136.) On March 3, 2022, the jury returned a verdict in favor of Plaintiff, awarding Plaintiff $200,000 in compensatory damages and $300,000 in punitive damages. (Doc. # 141.) The Court entered final judgment in favor of Plaintiff and against Defendant on March 8,

2022 (Doc. # 143), and on April 13, 2022, the Clerk of Court taxed costs in the amount of $12,000 against Defendant pursuant to the parties' stipulation (Doc. # 168).

## II. **DEFENDANT'S RENEWED MOTION UNDER FED. R. CIV. P. 50(b) OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL OR ALTERATION OR AMENDMENT OF THE JUDGMENT UNDER FED. R. CIV. P. 59**

Defendant argues that he is entitled to judgment as a matter of law under Fed. R. Civ. P. 50(b) because the evidence at trial was insufficient to demonstrate that Defendant (1) acted with malice in submitting the probable cause statement or (2) had the requisite *mens rea* for an award of punitive damages. (Doc. # 150 at 4–6.) In the alternative, Defendant requests a new trial under Fed. R. Civ. P. 59(a) on the grounds that the verdict was against the weight of the evidence with respect to malice and punitive damages. (*Id.* at 7–8.) In addition, Defendant renews his argument that he is entitled to qualified immunity. (*Id.* at 8–13.) Finally, Defendant seeks remittitur of the punitive damages award. (*Id.* at 13–15.)

## A. **LEGAL STANDARDS**

### 1. Federal Rule of Civil Procedure 50(b)

Under Rule 50(b), a party may make a renewed motion for judgment as a matter of law within 28 days of the entry of judgment. Fed. R. Civ. P. 50(b). In evaluating a motion brought under Rule 50(b), the Court examines all the evidence admitted at trial, construes that evidence and the inferences from it in the light most favorable to the non-moving party, and refrains from making its own credibility determinations, re-weighing the evidence, or substituting its conclusions for those of the jury. *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000); *see also Thunder Basin Coal*

*Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1212 (10th Cir. 1997) ("The jury . . . has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." (quoting *Kitchens v. Bryan Cnty. Nat'l Bank*, 825 F.2d 248, 251 (10th Cir. 1987))).

Instead, the Court has the narrow task of determining only whether the jury verdict is supported by substantial evidence when the record is viewed most favorably to the prevailing party. *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002). Substantial evidence is "something less than the weight of the evidence" and "is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence.'" *Id.* (quoting *Beck v. N. Natural Gas Co.*, 170 F.3d 1018, 1022 (10th Cir. 1999)). Judgment as a matter of law is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Finley v. United States*, 82 F.3d 966, 968 (10th Cir. 1996) (quoting *Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir. 1989)).

To preserve issues under Rule 50(b), a party must have moved for judgment as a matter of law under Rule 50(a) at trial. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000). Motions under Rule 50(a) must "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Fed. R. Civ. P. 50(a)(2). A party may not circumvent Rule 50(a) by raising for

the first time in a post-trial motion issues not raised in an earlier motion for directed verdict. *United Int'l Holdings*, 210 F.3d at 1228.

    2.    <u>Federal Rule of Civil Procedure 59</u>

Rule 59(a)(1)(A) provides that the Court may, "on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." If a new trial motion asserts that the jury verdict is not supported by the evidence, "the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009) (quoting *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999)).

Under Rule 59(e), a party may request alteration or amendment of the judgment. Grounds warranting a motion under Fed. R. Civ. P. 59(e) include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Such a motion is therefore "appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Id.* Rule 59(e) "permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2810.1, at 127–28 (2d ed. 1995)). It is thus "not appropriate to revisit issues already addressed

or advance arguments that could have been raised in prior briefing." *Servants of Paraclete*, 204 F.3d at 1012.

**B.    RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

1.    Malice Element

Defendant first argues that the judgment should be vacated because the evidence at trial was insufficient to demonstrate that he acted with malice in submitting the PC Statement. (Doc. # 150 at 4.) Specifically, Defendant contends that "there is no evidence that Coleman possessed exculpatory information when he authored the PC Statement." (*Id.*)

At trial, the only element of Plaintiff's malicious prosecution claim in dispute was whether Defendant acted with malice when he drafted the PC Statement. In order to establish that Defendant had the requisite state of mind, Plaintiff had to show that Defendant "knowingly, or with reckless disregard for the truth, include[d] false statements in an affidavit, or knowingly or recklessly omit[ted] from it information which, if included, would vitiate probable cause." *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015). To establish reckless disregard, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)). However, a factfinder "may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* (quoting *Beard*, 24 F.3d at 116). Omissions are made with reckless disregard "if an officer withholds a fact in his ken that any reasonable person would have known that

this was the kind of thing the judge would wish to know." *Id.* (quoting *Wilson v. Russo*,

212 F.3d 781, 787–88 (3d Cir. 2000)).

The Court disagrees with Defendant that there is "no evidence" that he

possessed exculpatory information when he authored the PC Statement. (Doc. # 150 at

4–5.) Viewing the record in the light most favorable to the prevailing party, substantial

evidence supports Plaintiff's position that Defendant was aware of exculpatory

information when he wrote the PC Statement. For example, the jury heard testimony

from Defendant that he ran a check in the National Crime Information Center ("NCIC")

database that confirmed a valid ID "hit" for Plaintiff's name and ID number. (Doc. # 163

at 310–13.)[1] Defendant testified that the NCIC search showed a valid California driver's

license in the system with the same ID number as the California ID that Plaintiff

presented, and Defendant agreed that this search was an indicator that the ID was

legitimate. (*Id.* at 313.) In addition, Defendant acknowledged that Plaintiff provided

several corroborating forms of identification that matched the biographical information

and picture on Plaintiff's California ID card, including multiple work ID badges from the

correctional facility where he was employed, firearm certificates, transport certificates,

other photographs, debit cards, a social security card, and a plane ticket. (*Id.* at 317.)

Defendant also testified that his colleague, Officer Craven, called Plaintiff's supervisor at

the correctional facility, who confirmed that a Juan Valenzuela worked at the facility, and

---

[1] The trial transcript has been filed in three parts. (Doc. ## 161, 163, 164.) The Court cites to the docket number (*e.g.*, Doc. # 163) and the page number of the transcript (*e.g.*, Doc. # 163 at 310).

that Defendant was aware of this conversation. (*Id.* at 318–19.) Defendant included none of this arguably exculpatory information in the PC Statement.

Defendant also contends there was no evidence that he was "presented with 'obvious reasons' to doubt whether the ID Card was forged." (Doc. # 150 at 4.) Defendant points to *Stonecipher* for the principle that a failure to investigate is insufficient to demonstrate malice and that he cannot be charged with omitting exculpatory information "that was not in fact known to him, i.e., not within his 'ken.'" (*Id.* at 4–5) (citing *Stonecipher*, 759 F.3d at 1142). While Defendant is correct that a failure to investigate is insufficient to establish malice, the Court finds that Plaintiff presented sufficient, substantial evidence for the jury to find that Defendant was presented with "obvious reasons" to doubt the veracity of his forgery allegations. In addition to the evidence cited above, Plaintiff provided extensive evidence about the security features of the ID card, including the "fine line design" running through the ID card and across the photo, the California Brown Bear pinholes, and the matching smaller holographic photo on the ID card. *See, e.g.*, (Doc. # 163 at 233–34.) Defendant testified that he was familiar with ID security features and that he took physical custody of the ID card and looked at it on February 15, 2017. (*Id.* at 302, 310.) Further, he agreed at trial that the fine line design was uninterrupted on the ID card across the photo and that the smaller holographic image matched the larger ID picture. (*Id.* at 303.) Drawing all reasonable inferences in favor of Plaintiff from this testimony, the Court finds that there was sufficient evidence to support a finding that Defendant was presented with "obvious"

reasons to doubt that the ID card was forged and that he omitted this exculpatory information from the PC Statement.

Because this evidence is sufficient to support the jury's verdict as to the malice element, the Court denies Defendant's motion for judgment as a matter of law on Plaintiff's malicious prosecution claim.

2.    Punitive Damages

Defendant next argues that he is entitled to judgment as a matter of law under Rule 50(b) because the trial evidence did not support punitive damages.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Eisenhour v. County*, 897 F.3d 1272, 1280 (10th Cir. 2018) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Although the *Smith* Court determined that it was "unnecessary to show actual malice to qualify for a punitive award, [the] intent standard, at a minimum, required recklessness in its subjective form." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). In describing "recklessness in its subjective form," the Supreme Court referred to a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Id.* (quoting *Smith*, 461 U.S. at 37 n.6, 41).

Defendant argues that "there is no evidence [Defendant] perceived any risk to Plaintiff's rights in drafting the PC Statement, let alone subjectively believed he was violating such rights." (Doc. # 150 at 6.) Defendant bases this argument in part on his contention that he "did not include false information or omit exculpatory facts" when

9

drafting the PC Statement. (*Id.* at 7.) For reasons already stated, the Court disagrees and concludes that the jury could have reasonably found that Defendant omitted several exculpatory facts from the PC Statement. Further, Defendant testified that he agreed that an officer should do everything they can to verify an ID before charging someone (Doc. # 163 at 289–90), that he was aware of security features on California IDs (*id.* at 291), and that he knew of Denver Police policies providing several ways to verify an ID, but that he did not try to verify the ID in any way other than running the NCIC check (*id.* at 328–29). Given the above evidence, combined with Defendant's 30 years of experience as a police officer and his extensive experience handling ID cards in 10 years at the airport (*id.* at 330), it was reasonable for the jury to conclude that Defendant was subjectively aware that omitting exculpatory facts from the PC Statement posed a risk of violating Plaintiff's rights. Moreover, the jury heard Defendant testify that he never even spoke to Plaintiff, who was sitting just feet away from him for an hour and a half in a holding cell. (*Id.* at 315, 320.)

The Court has thoroughly reviewed the record and is satisfied that the decision to submit the issue of punitive damages to the jury was not error. Reviewing the facts and drawing all inferences in favor of Plaintiff, the Court concludes that a reasonable jury could infer the kind of reckless or callous indifference for federally protected rights that would sustain an award of punitive damages. Accordingly, Defendant's renewed motion for judgment as a matter of law on the issue of punitive damages is denied.

## C.     DEFENDANT'S MOTION FOR A NEW TRIAL

In the alternative, Defendant moves for a new trial under Fed. R. Civ. P. 59(a) on the grounds that the jury's findings with respect to malice and punitive damages "were against the overwhelming weight of evidence." (Doc. # 150 at 7.) Defendant argues that rather than demonstrating malice, the overwhelming weight of the evidence shows that Defendant "was, at most, negligent." (*Id.*) However, Defendant does not point to specific evidence that overwhelmingly establishes negligence or precludes a finding of malice or punitive damages.

The Court incorporates its prior discussion summarizing some of the evidence presented at trial. Having carefully reviewed the record in this case, the Court finds that the jury's verdict was not "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Escue v. Northern OK College*, 450 F.3d 1146, 1157 (10th Cir. 2006). Rather, the jury had substantial evidence on which to base its findings that Defendant (1) acted with malice by recklessly omitting exculpatory information from the PC Statement and (2) was subjectively aware that omitting exculpatory information from the PC Statement posed a risk of violating Plaintiff's rights. Accordingly, the Court denies Defendant's alternative motion for a new trial under Fed. R. Civ. P. 59(a).

## D.     QUALIFIED IMMUNITY

Defendant also reasserts his argument that he is entitled to qualified immunity under Rule 50(b) or, in the alternative, Rule 59(e). (Doc. # 150 at 8.) Defendant previously asserted qualified immunity in his Motion for Summary Judgment. (Doc. # 70.) In her Order Granting in Part and Denying in Part Motions for Summary Judgment

(Doc. # 95), Judge Marcia S. Krieger determined that Defendant was not entitled to qualified immunity on Plaintiff's malicious prosecution claim (*id.* at 14–18). Accordingly, the claim proceeded to trial.

As a preliminary matter, the Court notes that Defendant did not raise qualified immunity in his Rule 50(a) motion. *See* (Doc. # 164 at 550–61.) Generally, a Rule 50(b) motion cannot assert grounds for relief not asserted in a Rule 50(a) motion. *Marshall v. Columbia Lea Regional Hosp.*, 474 F.3d 733, 738–39 (10th Cir. 2007). However, Plaintiff does not challenge the Rule 50(b) motion on the basis that Defendant failed to raise qualified immunity in his Rule 50(a) motion. *Cf. id.* (proceeding to evaluate qualified immunity because Plaintiff's failure to challenge the Rule 50(b) motion in his appellate brief specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion resulted in a waiver of the issue). Further, it is unsettled in this Circuit whether a defendant must raise qualified immunity in a Rule 50(a) motion as a prerequisite to raising it in a Rule 50(b) motion. *O'Neal v. Bd. of Cnty. Comm'rs of Cnty. of Fremont*, No. 16-cv-01005-TMT-KLM, 2020 WL 2526782, at *2 (D. Colo. May 18, 2020) ("As far as this court is aware, no decision of the Tenth Circuit has squarely held that failure to raise qualified immunity in a Rule 50(a) motion precludes the ability to raise it in a post-trial Rule 50(b) motion.").[2] The Court agrees with *O'Neal* and declines

---

[2] In *O'Neal*, Judge Timothy M. Tymkovich noted that "other circuits have held that failure to raise qualified immunity in a Rule 50(a) motion waives the defense in a subsequent Rule 50(b) motion." 2020 WL 2526782, at *2 (citing *Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir. 2010) ("The Defendants' failure to make a pre-verdict motion for judgment as a matter of law under Rule 50(a) on the grounds of qualified immunity precluded them from making a post-verdict motion under Rule 50(b) on that ground."); *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 n.9 (9th Cir. 2009); *Parker v. Gerrish*, 547 F.3d 1, 12–13 (1st Cir. 2008) ("[W]e have

to determine whether Defendant has waived qualified immunity, "especially given the court is satisfied, as further discussed below, that no such immunity is warranted." *Id.*

An individual defendant sued under § 1983 "may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017). "Once an individual defendant asserts qualified immunity, 'the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct.'" *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). Relevant to the instant case, a malicious prosecution claim under § 1983 includes the following five elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

1. Fourth Amendment Violation

Defendant first reiterates his previous arguments that Plaintiff cannot show that Defendant violated Plaintiff's Fourth Amendment rights. (Doc. # 150 at 8.) Specifically,

---

held that even if a defendant raises qualified immunity at summary judgment, the issue is waived on appeal if not pressed in a Rule 50(a) motion.")).

Defendant contends that Plaintiff has not established the first, third, and fifth elements of his malicious prosecution claim. (*Id.*)

> ### a.   Causation

With respect to the first element—that the defendant "caused the plaintiff's continued confinement or prosecution," *Wilkins*, 528 F.3d at 799—Defendant argues that the Court erred by determining that Plaintiff established causation as a matter of law. (Doc. # 150 at 9.) Defendant asserts that the issue of causation remained disputed and should have gone to the jury. The Court disagrees and finds no error in its prior ruling that Plaintiff established causation as a matter of law.

The Tenth Circuit has held that police officers who deliberately include misleading information in a probable cause statement may be liable for malicious prosecution. *Robinson v. Maruffi*, 895 F.2d 649, 656 (10th Cir. 1990). The court explained:

> [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision . . . . If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. **They cannot hide behind the officials whom they have defrauded**.

*Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)). Thus, "officers who **conceal and misrepresent material facts** to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous

convictions." *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004) (emphasis added).

Defendant makes several arguments against causation, including (1) the hearing at which the state judge made a probable cause determination was not a preliminary hearing and she was therefore not statutorily required to find probable cause; (2) it is disputed whether the state court judge considered the PC Statement in making a probable cause determination; (3) the prosecutor made an "independent charging determination" based on documents in addition to the PC Statement, which "also acted to cut off damages at that time"; and (4) there is no evidence that Defendant "deliberately" supplied misleading information in the PC Statement. (Doc. # 150 at 10.) The Court finds these arguments to be contrary to the principles expounded in *Robinson* and contradicted by the plain evidence submitted at summary judgment and at trial. For example, Plaintiff provided evidence at summary judgment showing that (1) at a hearing on February 16, 2017, the state court judge found that probable cause existed for forgery at the time of the arrest (Doc. # 87-17 at 1, 2), and (2) the booking and Sheriff's Department records, including the Bond Case Review documents, include only Defendant's PC Statement as a basis for this finding of probable cause (Doc. # 87-16 at 1–25). Further, Defendant's argument that causation and damages somehow "cut off" at the time of the prosecutor's "independent charging decision" goes directly against this Circuit's established authority in *Robinson* that police officers "cannot escape liability by pointing to the decisions of prosecutors." 895 F.2d at 656. Finally, it is evident that Defendant "concealed and misrepresented material facts" in authoring the PC

Statement. *Pierce*, 359 F.3d at 1292. The Court sees no error in its prior rulings that the PC Statement "contains no facts whatsoever addressing alteration," constituted "a completely conclusory statement" (Doc. # 95 at 17), and included a "false statement" that the ID was forged (Doc. # 144 at 12). As discussed previously, Plaintiff also provided substantial evidence of exculpatory facts that Defendant was aware of and omitted from the PC Statement.

For these reasons, the Court finds no error in its prior ruling that Plaintiff established causation as a matter of law.

   b.   *Probable Cause*

Defendant also challenges the Court's determination that Plaintiff established that "no probable cause supported the original arrest, continued confinement, or prosecution." *Wilkins*, 528 F.3d at 799. Defendant argues that the PC Statement was "based on" information from other officers and "merely documented an investigative hold," which makes it distinguishable from the arrest warrant at issue in *Puller v. Baca* and thus subject to a different standard.

"Affiants seeking arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause." *Puller*, 781 F.3d at 1197. When a plaintiff alleges a Fourth Amendment violation based on a deficient probable cause statement, the Court measures probable cause by "(1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified

affidavit establishes probable cause." *Id.* Applying this standard, the Court identifies no error in its prior conclusion that the PC Statement authored by Defendant was fundamentally deficient and that no reasonable juror could conclude that the PC Statement established probable cause because it "contained no facts, just the conclusory statement that the ID was forged." (Doc. # 144 at 6.)

Defendant's argument that the PC Statement "refers to the existence of probable cause" because it was "based upon the personal knowledge and observations of TSA officer Rebecca Peterson and the investigations of Ofc Craven and Cpl Wilkerson" (Doc. # 150 at 12) is unpersuasive because the Court cannot consider information that Defendant knew but did not include in the PC Statement. *See Wilkins*, 528 F.3d at 802 ("Judicial determination becomes a misnomer if information required to support probable cause remains at all times firmly lodged in the officer's head."); *see also Whitely v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971) ("[A]n otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate . . . . A contrary rule would, of course, render the [legal process] requirements of the Fourth Amendment meaningless."). Finally, the Court agrees with Plaintiff that Defendant's argument that the PC Statement initiated an "investigative hold" for forgery rather than directly charging the crime of forgery is "a distinction without a difference." (Doc. # 175 at 15.) The state court judge made a probable cause determination the day after Defendant authored the PC Statement, and the district attorney subsequently asserted the charge for forgery. *See* (Doc. # 87-17 at 1, 2.)

Defendant's position directly conflicts with the Tenth Circuit's precedent in *Puller* and *Robinson*, and the Court therefore declines to change its prior ruling that Plaintiff established the probable cause element as a matter of law.

    c.  *Malice*

   Finally, Defendant argues that Plaintiff cannot establish a Fourth Amendment violation because the element of malice was not met. (Doc. # 150 at 9.) Defendant reiterates his contention that the record "demonstrates negligence at most." (*Id.*) In addition, Defendant asserts that it was error for the Court to apply the malice inference that is available where a defendant causes a prosecution without probable cause pursuant to *Stonecipher*, 759 F.3d at 1146. (Doc. # 150 at 9.)

   First, for reasons already described, the Court finds that there was substantial evidence to support the jury's finding that Defendant acted with malice by omitting exculpatory information from the PC Statement. Second, the Court disagrees that it was error to instruct the jury on the malice inference. "Malice may be inferred if a defendant causes the prosecution without arguable probable cause." *Stonecipher*, 759 F.3d at 1146. Defendant points to *Grobecker v. Grundy*, No. 13-cv-01190-MSK-KLM, 2014 WL 3593513, at *9 (D. Colo. July 18, 2014), for the proposition that "cases from this District . . . have found the inference applicable only when an officer supplied false or misleading information that furthered the prosecution." However, the Court already found that Defendant supplied a false statement of fact with his conclusory assertion that the ID was forged. (Doc. # 144 at 12.) Further, as previously recited, there is significant evidence to support a finding that Defendant supplied "misleading"

information in the PC Statement by omitting any exculpatory information and any factual basis for probable cause to believe that Plaintiff committed felony forgery. Accordingly, the Court rejects Defendant's argument and concludes that it was not error to instruct the jury on the malice inference.

For these reasons, the Court finds that Plaintiff established a Fourth Amendment violation and Defendant is not entitled to qualified immunity on that basis.

2.    Clearly Established

Next, Defendant argues that the Court erred in denying Defendant qualified immunity because the law is not clearly established that a conclusory probable cause statement violates an arrestee's Fourth Amendment rights. (Doc. # 150 at 12.) Defendant contends that there is no sufficiently analogous precedent that would place Defendant on notice that his actions constituted a constitutional violation. (*Id.*)

It is clearly established that it "is a violation of the Fourth Amendment for an arrest warrant affiant to knowingly, or with reckless disregard for the truth, include false statements in the affidavit, or to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (citation and internal quotation marks omitted). Further, it is clearly established that officers "who conceal and misrepresent material facts to the district attorney" are subject to liability for a § 1983 claim for malicious prosecution. *Pierce*, 359 F.3d at 1292. This aligns with the Supreme Court's precedent that an officer is not entitled to qualified immunity if "a reasonably well-trained officer in [the same] position would have known that his affidavit failed to establish probable

19

cause." *Malley v. Briggs*, 475 U.S. 335, 345–46 (1986) (noting that a deficient affidavit "created the unnecessary danger of an unlawful arrest" and finding "it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment"). The Court therefore agrees with Judge Krieger's prior ruling that "[e]ven in the absence of on-point caselaw, no reasonable police officer would believe that a completely conclusory statement charging a defendant with a crime would suffice to establish probable cause." (Doc. # 95 at 17.) Defendant is not entitled to qualified immunity, and the Court therefore denies his motion with respect to his reassertion of qualified immunity.

## E.    REMITTITUR

Finally, Defendant requests remittitur of the punitive damages award on the basis that the amount is violative of due process. (Doc. # 150 at 13.) Defendant contends that the jury's punitive damages award of $300,000 is excessive, particularly given the $200,000 that the jury awarded for compensatory damages. (*Id.* at 14.)

Punitive damages are available in a § 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. In analyzing the constitutionality of a punitive damage award, the Court examines the factors articulated by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). Those factors are: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the

punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003). The Court will address each factor in turn.

1.      Reprehensibility of Defendant's Conduct

The degree of reprehensibility is "perhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. In evaluating reprehensibility, the Court considers the following factors:

> (1) whether the harm caused was physical as opposed to economic; (2) whether the defendant acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Jones v. United Parcel Service, Inc.*, 674 F.3d 1187, 1207 (10th Cir. 2012).

On balance, the factors weigh in favor of finding Defendant's misconduct reprehensible. With respect to the first factor, the Court notes that Plaintiff's injuries were not physical, but neither were they purely economic. Plaintiff suffered emotional pain and fear as a result of his detention and four-month prosecution: He testified that he has not flown and will not fly again, he fears the police, he lost faith in the justice system, and he suffered significant emotional harm from losing his job and his family being separated because he could not provide for his children. (Doc. # 163 at 183–85.) The Court views Plaintiff's "ostensibly emotional or psychological injury" as "more reprehensible than strictly economic harm, if not equivalent to physical harm." *Mackey v. Watson*, No. 17-cv-01341-CMA-STV, 2020 WL 4734339, at *2 (D. Colo. Aug. 14,

2020). Accordingly, the Court finds that this factor weighs in favor of a finding of reprehensibility.

The Court also finds that the financial vulnerability of Plaintiff tilts in favor of finding Defendant's conduct reprehensible. Plaintiff was the sole breadwinner for his family, and his family moved to Colorado, away from their support system in California, in order for Plaintiff to work as a correctional officer. (Doc. # 163 at 179.) Plaintiff lost his job as a result of the felony charges in this case. He and his wife testified about how this lost income had severe repercussions on their family, including that they were unable to pay bills and were forced to send their children to live in California because they were unable to support them, particularly given their daughter's health condition. (*Id.* at 181–82.) Plaintiff also presented evidence of late fees incurred for basic utility bills (*id.* at 167–72), and he testified about how difficult it has been for him to secure employment because of the felony charge continuing to appear on background checks (*id.* at 178–81).

Next, the Court notes that Plaintiff provided evidence that Defendant's misconduct was not limited to this isolated incident of a deficient probable cause statement, but that Defendant authored at least three other similarly deficient and conclusory probable cause statements in other cases. Defendant also testified that he had been "writing [probable cause statements] that way for 30 years." (Doc. # 164 at 433.) Finally, with respect to the last factor, the Court credits the jury's determination that Defendant's misconduct was not "mere accident" or "mere negligence," but rather constituted malice. The evidence supports the jury's finding that Defendant's reckless

disregard for Plaintiff's constitutional rights was neither accidental nor negligent, and thus the fifth factor weighs in favor of finding his misconduct reprehensible.

In sum, the Court finds that the evidence showed that Defendant's misconduct was reprehensible such to support the award of punitive damages.

2.    Relationship Between Harm and Punitive Damages Award

Next, the Court examines the ratio of the punitive damages award to the compensatory award. There are no bright-line rules that limit the degree to which punitive damages may outstrip compensatory damage awards, although the Supreme Court has suggested that "few awards exceeding a single-digit ratio . . . will satisfy due process." *State Farm*, 538 U.S. at 425. For example, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)). In examining this factor, the Court should keep in mind the degree of actual harm suffered by the plaintiff and awarded by the jury: A particularly generous compensatory award might justify only a small ratio of compensatory to punitive, whereas a case involving compensatory damages of minimal value could support a more generous punitive award. *Id.*

Plaintiff was awarded $300,000 in punitive damages and $200,000 in compensatory damages. A 3:2 ratio does not "push the boundaries of due process requirements." *Jones*, 674 F.3d at 1208; *see White v. Wycoff*, No. 13-cv-01761-CMA-MJW, 2016 WL 9632873, at *5 (D. Colo. June 24, 2016) (finding that a 3:1 ratio of $300,000 punitive damages and $100,000 compensatory damages did not offend due

process). However, the Court must also consider the facts and circumstances of the case and whether Plaintiff's compensatory damages award was particularly generous. *See State Farm*, 538 U.S. at 425. Although Plaintiff's economic damages were stipulated at $15,000, the Court notes that Plaintiff's emotional and psychological harms were substantial and are difficult to quantify. Accordingly, the Court concludes that the jury's award of $200,000 in compensatory damages was not especially generous in light of the harms suffered by Plaintiff as a result of his detention, prosecution, and the loss of his job. The Court finds that the $200,000 award constitutes fair and adequate compensation for Plaintiff's harms and is not disproportionate. Therefore, this factor weighs against altering the punitive award.

   3. <u>Comparison to Civil Penalties Owed in Similar Cases</u>

  Defendant argues that the $300,000 punitive damages award here is "significantly higher than in other similar cases" and cites select examples of other cases with lower punitive damages awards for Fourth Amendment claims. (Doc. # 150 at 14.) However, this factor "does not invite a race to the law library to find verdicts upheld or overturned in cases involving similar claims." *Martinez v. Valdez*, 125 F. Supp. 3d 1190, 1210 (D. Colo. 2015). Rather, *Gore* instructs that this factor is premised upon the notion that "**legislative** judgments concerning appropriate sanctions for the conduct at issue" constitute an alternative indicium of excessiveness. 517 U.S. at 583 (emphasis added). For example, *Gore*, which involved deceptive trade practices, considered "[t]he maximum civil penalty authorized by the Alabama Legislature for a violation of its Deceptive Trade Practices Act." *Id.* at 584.

There is no comparable statutory penalty for a malicious prosecution claim under § 1983, but the purpose and underlying policy considerations of the statute overlap with the intended goals of awarding punitive damages. *See Smith*, 461 U.S. at 49 (observing that "deterrence of future egregious conduct is a primary purpose of both § 1983 and of punitive damages" (citation omitted)). Further, having reviewed cases cited by both parties and other similar cases, the Court finds that there is no overwhelming consensus among courts that the particular damages awarded here are or are not excessive under similar circumstances.

After considering the factors in *Gore*, the Court declines to disturb the punitive damages awarded by the jury. The Court finds that the award was not "motivated by passion, prejudice, or bias," and is not so excessive as to "shock the court's judicial conscience." *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1560 (10th Cir. 1991). Accordingly, Defendant's request for remittitur of the punitive damages award is denied.

### III.   <u>PLAINTIFF'S MOTION FOR PREJUDGMENT INTEREST</u>

Next, the Court will address Plaintiff's Motion for Prejudgment Interest (Doc. # 151), wherein Plaintiff seeks an award of prejudgment interest on the jury's award of $200,000 in compensatory damages. Plaintiff does not seek prejudgment interest on the punitive damages award.

### A.   APPLICABLE LAW

"An award of prejudgment interest is within the district court's discretion." *Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1073 (10th Cir. 2008) (quoting *Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.*, 25

F.3d 1493, 1506 (10th Cir. 1994)). The purpose of prejudgment interest under federal law is "to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of judgment." *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 746 (10th Cir. 1993) (quoting *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256 (10th Cir. 1988)). While prejudgment interest is typically awarded in federal cases, "it is not recoverable as a matter of right." *Id.* Instead, courts conduct a two-step analysis to determine first, whether an award of prejudgment interest "would compensate the injured party" and, second, whether "the equities would preclude an award." *White v. Chafin*, 862 F.3d 1065, 1068 (10th Cir. 2017).

## B. ANALYSIS

In the instant case, the jury awarded Plaintiff $200,000 in compensatory damages, categorized as $35,000 for lost liberty, $15,000 for economic costs, $50,000 for reputational harm, and $100,000 for physical or emotional pain and mental anguish. (Doc. # 141 at 2.) The jury was instructed that the parties stipulated that Plaintiff "lost approximately $14,000 in wages and/or benefits during the four-month period from February 17, 2017, to June 5, 2017" as a result of losing his job as a correctional officer. (Doc. # 137 at 8.)

### 1. Noneconomic Damages

Defendant argues that prejudgment interest on **noneconomic** damages— totaling $185,000 of the full award—is unnecessary to compensate Plaintiff and would be inequitable. (Doc. # 174 at 2.) The Tenth Circuit has not conclusively resolved whether prejudgment interest for noneconomic damages may properly be considered

"compensatory" or whether it is equitable to award prejudgment interest for noneconomic damages. *See Echon v. Sackett*, No. 14-cv-03420-PAB-NYW, 2019 WL 8275344, at *9 (D. Colo. Feb. 12, 2019); *White v. Wycoff*, No. 13-cv-01761-CMA-MJW, 2016 WL 9632932, at *2 (D. Colo. July 7, 2016) (noting that the court had not found any "Tenth Circuit precedent dispositive of the issue"), *aff'd*, *White v. Chafin*, 862 F.3d 1065 (10th Cir. 2017). However, a number of trial courts have found "the notion of prejudgment interest to be incompatible with the concept of non-economic damages." *Clawson v. Mt. Coal Co.*, No. 01-cv-02199-MSK-MEH, 2007 WL 201253, at *14 (D. Colo. Jan. 24, 2007); *see, e.g.*, *Echon*, 2019 WL 8275344, at *10 (stating that assessing prejudgment interest on plaintiffs' noneconomic damages would be fundamentally at odds with the compensatory purpose of prejudgment interest); *Chatman v. Buller*, 2013 WL 5729603, at *3 (E.D. Okla. Oct. 22, 2013) (declining to award prejudgment interest on noneconomic damages).

Prejudgment interest is designed to compensate a plaintiff for the "monetary value of his loss." *White*, 2016 WL 9632932, at *2. "Put differently, the doctrine of prejudgment interest recognizes the time value of money, and compensates for lost value that would have otherwise accrued had the plaintiff been able to invest or gather interest on monies that were lost as a result of his injury." *Id.* The Court agrees with other courts that have determined that an award of prejudgment interest on noneconomic damages is not "compensatory" because it does not represent "the return of the loss of the use of money." *Wilson v. Burlington N. R.R. Co.*, 803 F.2d 563, 567 (10th Cir. 1986) (McKay, J., concurring). An award of prejudgment interest on non-

economic damages would "imply the preposterous notion that one's suffering could, at the time, have been used as an investment vehicle." *White*, 2016 WL 9632932, at *2 (quoting *Clawson*, 2007 WL 201253, at *14). Applying these principles, the Court determines that prejudgment interest on Plaintiff's noneconomic damages would not be compensatory in this case.

Plaintiff argues that prejudgment interest on noneconomic damages is nevertheless appropriate because "the principle noneconomic harms accrued during a distinct period of time, from February 16 to May 26, 2017." (Doc. # 151 at 9.) In so arguing, Plaintiff implies "that noneconomic damages are incurred instantly at a discrete point in time and that any delay in payment is compensable." *White*, 862 F.3d at 1069. The Court declines to make this assumption. While Plaintiff is correct that the jury was directed to consider a specific three-month time frame for stipulated economic damages, the jury was given no such guidance for evaluating noneconomic damages. Further, the jury heard testimony that Plaintiff's pain and suffering and reputational harm extended for months and years after Plaintiff's arrest in 2017. Thus, the Court finds in its discretion that the jury reasonably could have ascertained Plaintiff's noneconomic damages calculated to the time of trial. *See, e.g.*, *Wilson*, 803 F.2d at 567 ("Pain and suffering is a sentimental award which has been engrafted onto awards for economic loss through common-law evolution. The jury or court award of this amount is merely the reduction of that sentimental value to dollars at the time of judgment . . . .").

For the foregoing reasons, the Court finds that the equities do not weigh in favor of an interest award for noneconomic damages sustained in this case.

2.    Economic Damages

In addition to noneconomic damages, the jury awarded $15,000 in compensatory damages for economic costs. (Doc. # 141 at 2.) Defendant does not appear to challenge Plaintiff's request for prejudgment interest on this amount. *See* (Doc. # 174.) The Court finds that the equities support an award of prejudgment interest for economic damages and grants Plaintiff's motion with respect to $15,000 in economic costs.

3.    Applicable Prejudgment Interest Rate and Calculation

Because there is no federal statutory interest rate on prejudgment interest, the rate imposed is left to the district court's discretion. *Kleier Advert., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1042 n.4 (10th Cir. 1990). Plaintiff asks the Court to calculate prejudgment interest using the IRS underpayment rate set by 26 U.S.C. § 6621(a)(2) compounded annually, which Plaintiff states is 4.26% as of April 2022, the date of his motion. (Doc. # 151 at 10.) Defendant contends that any prejudgment interest award should accrue at the post-judgment interest rate set pursuant to 28 U.S.C. § 1961, which Defendant submits is 2.03%. (Doc. # 174 at 10–11.) In the alternative, Defendant asks the Court to utilize the applicable IRS underpayment rate, which Defendant states is 3.3%. (*Id.* at 11.)

The Court agrees with other courts in this district that have awarded prejudgment interest in § 1983 cases using the IRS underpayment rate set by 26 U.S.C. § 6621(a)(2). *See Valdez v. Motyka*, No. 15-cv-0109-WJM-STV, 2021 WL 5051666, at *3 (D. Colo. Nov. 1, 2021) (utilizing the IRS underpayment rate to calculate prejudgment interest for a plaintiff's economic damages in a § 1983 case). However, the Court

disagrees with the different "applicable" underpayment rates submitted by the parties.[3] The underpayment rate under 26 U.S.C. § 6621(a)(2) is the sum of "the Federal short-term rate determined under subsection (b)" plus "3 percentage points." Subsection (b) provides that "[t]he Secretary shall determine the Federal short-term rate for the first month in each calendar quarter." The applicable IRS underpayment rate for March 2022, when the Court entered judgment in this case, is 3%. Rev. Rule. 2021-24, 2021-50 I.R.B. 850; *see* I.R.S. News Release IR-2021-234 (Nov. 23, 2021), *available at* https://www.irs.gov/newsroom/interest-rates-remain-the-same-for-the-first-quarter-of-2022 (identifying 3% as the rate for underpayments for the calendar quarter beginning January 1, 2022).

The Court finds that the applicable IRS underpayment rate of 3% reasonably approximates the lost earning investment opportunity and will appropriately compensate Plaintiff for the loss of his money. Further, the Court agrees with Plaintiff that prejudgment interest should be calculated starting on May 26, 2017—the date Plaintiff's criminal charges were dismissed—through March 8, 2022—the day the Court entered judgment in this action. (Doc. # 151 at 10.) At 3% compounded annually, the total prejudgment interest on Plaintiff's economic damages is $2,279.50.[4]

---

[3] Plaintiff posits that the applicable underpayment rate is 4.26% as of April 2022 (Doc. # 151 at 10), whereas Defendant submits that the "current" rate is 3.3% (Doc. # 174 at 11). Although Defendant cites to the IRS website for applicable federal rates, Defendant does not identify what month or quarter he used to derive 3.3%. (*Id.* at 11, 11 n.6.)

[4] The Court's calculation regarding prejudgment interest is set forth below:

| Period | Compensatory Amount | Prejudgment Interest Rate | Interest |
|---|---|---|---|
| 5/26/2017–5/25/2018 | $15,000.00 | 3% | $450.00 |

For the foregoing reasons, the Court grants Plaintiff's Motion for Prejudgment Interest (Doc. # 151) with respect to awarding prejudgment interest on economic damages and denies the Motion with respect to awarding prejudgment interest on the remainder of the compensatory award. The judgment shall be amended to reflect a prejudgment interest award of $2,279.50.

## IV.    PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS

Finally, the Court will address Plaintiff's Motion for Attorney's Fees and Costs (Doc. # 149).[5] Plaintiff requests the Court award $580,792.50 for approximately 1,357 hours of attorney time (Doc. # 149 at 9), plus a supplemental amount of $21,476.50 for approximately 48.5 hours spent on the post-trial motions addressed in this Order (Doc. # 182 at 2), for a total of $602,269 in attorney fees. In response, Defendant argues that a 60% reduction in hours claimed is warranted due to improper block-billing, failure to exercise billing judgment, and limited success. (Doc. # 173 at 2.) Further, Defendant contends that Plaintiff's counsel's claimed hourly rates should be adjusted and disputes the amount of fees that are appropriate for hours expended on post-trial motions. (*Id.*; Doc. # 182 at 3–4.) As such, Defendant submits that Plaintiff should be awarded no more than $199,684 in attorney fees. (Doc. # 173-2 at 1.)

| 5/26/2018–5/25/2019 | $15,450.00 | 3% | $463.50 |
|---|---|---|---|
| 5/26/2019–5/25/2020 | $15,913.50 | 3% | $477.41 |
| 5/26/2020–5/25/2021 | $16,390.91 | 3% | $491.73 |
| 5/26/2021–3/8/2022 | $16,882.64 | 3% x (286 days / 365 days in a year) | $396.86 |
| | | **Total Prejudgment Interest** | **$2,279.50** |

[5] After Plaintiff filed his motion, the parties stipulated to costs of $12,000. (Doc. # 167.) The Clerk accordingly taxed costs in the amount of $12,000 against Defendant and in favor of Plaintiff. (Doc. # 168.) The issue of costs is therefore fully resolved.

**A.    APPLICABLE LAW**

In a civil rights action under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Because the purpose of § 1988 is to ensure "effective access to the judicial process," a prevailing plaintiff in a § 1983 case "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citations omitted). Here, because there is no question that Plaintiff is the prevailing party, the only inquiry is whether Plaintiff has established that the fee request is "reasonable." *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir. 1998).

When evaluating a motion for attorney fees, the Court follows the three-step process set forth in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983), *overruled on other grounds by Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987). The first step in determining a fee award is to determine the number of hours reasonably spent by counsel for the prevailing party. *Malloy v. Monahan*, 73 F.3d 1012, 1017 (10th Cir. 1996); *Ramos*, 713 F.2d at 553. Time spent by counsel that is "excessive, redundant, or otherwise unnecessary" is not compensable. *Hensley*, 461 U.S. at 434. "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* at 433.

Next, the Court must determine a reasonable hourly rate of compensation. *Ramos*, 713 F.2d at 555. "A reasonable rate is the prevailing market rate in the relevant

community." *Malloy*, 73 F.3d at 1018. The party seeking the award has the burden of persuading the Court that the hours expended, and the hourly rate, are reasonable. *Id.* Finally, at step three, the Court must multiply the reasonable hourly rate by the number of hours reasonably expended to determine the lodestar amount. *Id.*

**B.   ANALYSIS**

   1.   <u>Reasonableness of the Hours Expended</u>

   In determining the reasonableness of the hours expended, the Court considers several factors, including: (1) whether the amount of time spent on a particular task appears reasonable in light of the complexity of the case, the strategies pursued, and the responses necessitated by an opponent's maneuvering; (2) whether the amount of time spent is reasonable in relation to counsel's experience; and (3) whether the billing entries are sufficiently detailed, showing how much time was allotted to specific task. *See Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 538, 542 (10th Cir. 2000); *Ramos*, 713 F.2d at 553–55. Counsel has the burden of proving hours to the district court by "submitting meticulous, contemporaneous time records." *Case v. Unified Sch. Dist. No. 233, Johnson Cnty.*, 157 F.3d 1243, 1250 (10th Cir. 1998). Once the Court "has adequate time records before it, it must then ensure that the winning attorneys have exercised 'billing judgment.'" *Id.* (quoting *Ramos*, 713 F.2d at 553). "Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended." *Id.*

   In the instant case, Plaintiff requests payment for approximately 1,405 hours of billable work. (Doc. # 149 at 9; Doc. # 182-1 at 1–2.) Plaintiff asserts that his counsel

exercised billing judgment by eliminating all duplicate entries by multiple attorneys at the Civil Rights Litigation Group who worked on the same tasks, including hearings, strategy meetings, and conferral meetings where more than one attorney was present. (Doc. # 149 at 4.) In such situations, Plaintiff's counsel counted the hours only toward the hours of lead counsel, Mr. Raymond Bryant. Plaintiff's counsel also eliminated all hours of Zach Shiffler, an attorney who spent approximately 28 hours in three days assisting during trial with technology, research, and other tasks in the courtroom. (*Id.* at 5.) In support of the requested hours, Plaintiff submitted approximately 29 pages of billing records detailing the time expended by Mr. Bryant and associates Vinyanka Prasad and Rachel Maxam at the Civil Rights Litigation Group and by Mr. Luke McConnell of the law firm Mulligan Breit McConnell LLC, who joined the case as co-counsel for the jury trial. (Doc. # 149-2; Doc. # 149-3; Doc. # 182-1.)

   *a.* *Block Billing*

  Defendant makes several arguments that Plaintiff's counsel's hours are unreasonable. (Doc. # 173 at 2.) First, Defendant contends that Plaintiff's counsel's hours are inappropriately block-billed. (*Id.* at 3.) "'Block-billing' refers to the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n.15 (10th Cir. 1996). The Tenth Circuit does not have a *per se* rule against block billing; however, the Court "may discount requested attorney hours if the attorney fails to keep 'meticulous, contemporaneous records' that reveal 'all hours for which compensation is requested

and how those hours were allotted to specific tasks.'" *Cadena v. Pacesetter Corp.*, 224

F.3d 1203, 1215 (10th Cir. 2000) (quoting *Ramos*, 713 F.2d at 553) (emphasis omitted).

In this case, the Court finds that some of Plaintiff's counsel's time entries are

inappropriately recorded such that they do not sufficiently allow the Court to determine

the time allotted by Plaintiff's counsel to specific tasks and the reasonableness of that

time. For example, Plaintiff's counsel includes the following entries that extend over

several days of time:

- 2/25/20–3/9/20, 23.9 hours for "P reply to D response to P 702 Motion. Doc. 81." (Doc. # 149-2 at 14.)

- 9/1/21–9/6/21, 20 hours for "Drafted and submitted proposed jury instructions to Court." (*Id.* at 18.)

- 10/10/21–10/19/21, 26 hours for "Drafted, edited, and submitted 29-page CSS for settlement conference." (*Id.* at 20.)

Further, Plaintiff's counsel regularly included several tasks in single day entries without

specifying how much time was spent on each task:

- 2/18/22, 10.5 hours for "Trial Prep: Drafted objections to D exhibits, responded to D new jury instruction. Drafted new malice and forgery instruction. Drafted witness questions. Prepared damages chart. Scheduled and conferred with client re: tech meeting and courtroom visit." (*Id.* at 21.)

- 2/21/22, 7.2 hours for "Preparing for trial, including drafting witness examinations, drafting opening statement, reviewing case materials, and preparing deposition designations. Telephone conferences with co-counsel." (Doc. # 149-3 at 5.)

Because this use of block-billing and multi-day entries makes it difficult for the Court to

ascertain the amount of time spent on certain tasks or evaluate the reasonableness of

those hours, the Court finds that a modest reduction of fees is warranted. *See, e.g.*,

*Devon Energy Prod. Co., L.P. v. Line Finders, LLC*, No. CIV-20-636-F, 2021 WL

5182668, at *2 (W.D. Okla. Nov. 8, 2021) (finding "a general reduction of 15%
appropriate" because the billing records did not allocate the precise amounts of time
spent on each particular task).

            *b.*   *Billing Judgment*

       Defendant next argues that the fee request does not reflect billing judgment.
(Doc. # 173 at 7.) Among other examples, Defendant points to the 178 hours Mr. Bryant
spent preparing the response to Defendants' Motion for Summary Judgment, in addition
to 16.5 hours spent by an associate. (Doc. # 149-2 at 14–16.) Defendant contends that
the number of hours spent on the response, in addition to other examples of numerous
hours spent on motions practice, is unreasonable and unnecessary. Further, Defendant
argues that Mr. Bryant and Mr. McConnell billed duplicative time in several entries,
including charging for meetings between counsel and billing for both attorneys to attend
conferrals with defense counsel without adequate justification for why duplicative billing
was necessary. (Doc. # 173 at 9–10.) Defendant also asserts that there are errors and
inconsistencies in billing entries, such as an entry by Mr. Bryant on November 15, 2021,
for 21 hours expended on "Work and editing on brief re: Scope of Admissible Evidence
for Trial ordered by Judge Arguello. Doc. 126." (Doc. # 149-2 at 20.) Defendant asserts
that even if Mr. Bryant spent 21 hours in a single day on that brief, "there can be no
doubt that number likely includes breaks, inefficiencies, and non-compensable time."
(Doc. # 173 at 12.)

       After carefully reviewing the billing records submitted by Mr. Bryant and Mr.
McConnell, the Court concludes that a discount to Plaintiff's requested fee award is

appropriate for the above examples of excessive hours and improper billing judgment. However, the Court is also mindful that this litigation extended for over four years, involved significant motions practice, included additional briefing requested by the Court, and culminated in a three-day trial with a verdict for Plaintiff and a substantial damages award. For the most part, the billing entries appropriately reflect significant time spent on a case that was hard fought on both sides. The Court therefore finds that only a modest discount is warranted for excessive hours and billing judgment.

        *c.*    *Unsuccessful Claims*

In addition, Defendant asks the Court to adjust attorney's fees on the basis that Plaintiff is not entitled to fees for unsuccessful claims. (Doc. # 173 at 13.) Defendant points out that although Plaintiff was successful at trial, Plaintiff was unsuccessful at summary judgment on his claim for unlawful arrest against five other defendants, his supervisory liability claim against two defendants, and his *Monell* claim against Denver. (*Id.* at 13–14.)

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435. However, where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436. Plaintiff certainly received an "excellent" result at trial; however, the Court acknowledges that Plaintiff was unsuccessful with respect to several other claims against multiple defendants. *See Valdez*, 2022 WL 1092182, at *4 (reducing attorney's fees to "tak[e] into account the claims on which Plaintiff was unsuccessful,"

notwithstanding his "outstanding trial results"); *see also Martinez*, 125 F. Supp. 3d at 1215 ("The purpose of reducing a fee claim to reflect partial success is to eliminate compensation for hours spent solely in the pursuit of substantive claims on which the [p]laintiffs did not prevail . . . ."). Accordingly, the Court finds that a modest reduction of the compensable hours claimed by Plaintiff is appropriate to reflect the unsuccessful claims pursued in this case.

After carefully reviewing the documentation submitted by the parties and the applicable law, the Court finds that Defendant's requested reduction of 60% of Plaintiff's counsel's hours is excessive and unsupported by the record. Instead, the Court finds in its discretion that a moderate reduction of 20% of the hours claimed by Plaintiff is appropriate and properly reflects a reasonable number of hours expended in this case. This amount reflects Plaintiff's successful trial verdict while also taking into account the presence of some duplicative, block-billed, and excessive billing entries and Plaintiff's unsuccessful claims. Accordingly, the Court will reduce Plaintiff's requested attorney fee award by 20%.

       2.   <u>Reasonableness of Hourly Rate</u>

Next, the Court assesses the reasonableness of the hourly rates requested by Plaintiff in this case. Plaintiff requests fees at a rate of $450 per hour for Mr. Bryant, lead counsel in this case, and $400 per hour for Mr. McConnell, who joined as co-counsel for trial. (Doc. # 149 at 9.) In addition, Plaintiff asks the Court to approve hourly rates of $375 and $325 per hour for associates Ms. Prasad and Ms. Maxam, respectively. (*Id.*) In support, Plaintiff provides the Declaration of Darold W. Killmer

(Doc. # 149-4), a partner at the Denver law firm of Killmer, Lane & Newman, LLP and experienced civil rights attorney. Mr. Killmer asserts that the hourly rates of the attorneys who represented Plaintiff in this matter "are well within the ranges charged within the Colorado legal community and are reasonable rates." (*Id.* at 6.)

Defendant argues that the requested rates are not reasonable because they are "at the high end of the local market." (Doc. # 173 at 14.) Defendant contends that Mr. Bryant's rate should be adjusted to $400 per hour because he had less than eight years of legal experience in Colorado when he began billing this case in 2017. Defendant also argues that Mr. McConnell's rate should be adjusted to $350 per hour because he has "an unknown amount of experience in civil litigation or civil rights actions." (*Id.* at 14–15.) Finally, Defendant objects to the rates for associates and asserts those rates should be adjusted to $250 per hour because the associates did not have experience in civil rights cases prior to working on this case. (*Id.* at 15.)

The Court does not find Defendant's hourly rate arguments to be persuasive. The Court notes that Mr. Bryant has over ten years of experience as a licensed attorney in Colorado, is the sole owner of the Civil Rights Litigation Group, PLLC, and has extensive experience with civil rights cases. (Doc. # 149 at 6.) Further, Mr. McConnell, who became involved with this case as co-counsel for the jury trial, has completed 94 jury trials and has been a licensed attorney in Colorado for 13.5 years, practicing first as a public defender and then as a private criminal defense and civil rights attorney. (Doc. # 149-3 at 2.) Plaintiff also demonstrated that Ms. Prasad has been practicing law since 2009, including as a criminal defense attorney and as Chief Appellate Attorney in the

Federal Defenders Office, and Ms. Maxam has over six years of experience as a civil litigator. (Doc. # 149-1 at 3.)

After carefully considering the parties' arguments, Plaintiff's exhibits, and the applicable case law, the Court concludes that Plaintiff's requested hourly billing rates are reasonable for civil rights attorneys of comparable skill and experience in the local market. *See, e.g.*, *Valdez*, 2022 WL 1092182, at *3 (approving hourly rates of $575 to $595 per hour for work performed by shareholders and special counsel and $375 per hour for work performed by associates in a § 1983 action). As such, the Court will apply the hourly billable rates requested by Plaintiff in determining the appropriate fee award.

For the foregoing reasons, the Court will award Plaintiff $464,634 in attorney's fees, which represents 80% of Plaintiff's original fee request of $580,792.50.

### 3.   Plaintiff's Supplemental Fees Request

Finally, the parties dispute whether Plaintiff should be awarded supplemental attorney's fees for work expended after the initial motion for attorney's fees was submitted on April 5, 2022. (Doc. # 182.) Plaintiff requests a supplemental amount of $21,476.50 in attorney's fees for 48.55 hours of work relating to the post-trial motions addressed in this Order. (Doc. 182-1.) Defendant does not oppose an award of "reasonable" fees but makes several arguments against Plaintiff's supplemental fee request, including: (1) Plaintiff's 20-page Response to Defendant's Rule 50 Motion (Doc. # 175) failed to comply with this Court's practice standards limiting responses to 15 pages and setting font and text size requirements (Doc. # 181 at 1); (2) Plaintiff should not be awarded fees for a "fees-on-fees" dispute because Plaintiff's original fee

request was unreasonable; and (3) Plaintiff is not entitled to fees for hours expended briefing his Motion for Prejudgment Interest (Doc. # 151) because his prejudgment interest request has no merit. (Doc. # 182.)

First, the Court agrees with Defendant that Plaintiff failed to comply with this Court's practice standards by exceeding page limits and using a different font in Plaintiff's Response to Defendant's Rule 50 Motion. *See* CMA Civ. Practice Standard 10.1(b) & (d). However, the Court disagrees that declining to award any fees for this noncompliance is an appropriate sanction in this instance. Rather, the Court will apply a 10% reduction to the hours expended on Plaintiff's Response to Defendant's Rule 50 Motion, reducing the hours from 19.5 to 17.5.

Next, the Court declines to reduce attorney's fees based on Defendant's assertion that Plaintiff should not be awarded for a "fees-on-fees" dispute. "The Tenth Circuit generally allows recovery of fees for an attorney's work in seeking attorney's fees." *Cummins v. Campbell*, 44 F.3d 847, 855 (10th Cir. 1994). "However, the award of fees for the preparation of the fee application is not without limits." *Id.* A district court has broad discretion to deny an award for hours spent pursuing fees if the fee petitioner was unsuccessful or if the "underlying claim for fees was unreasonable." *Id.* In this case, the Court finds that reducing fees for hours spent on Plaintiff's fee request is not warranted because Plaintiff was "largely successful" in his Motion for Attorney's Fees and the request was not unreasonable. *White v. Chafin*, No. 13-cv-01761-CMA-MJW, 2016 WL 9735066, at *6 (D. Colo. Sept. 23, 2016) (awarding "[f]ees for fees").

Finally, the Court rejects Defendant's argument that Plaintiff is not entitled to fees for hours expended on his Motion for Prejudgment Interest (Doc. # 151) on the basis that "Plaintiff's position on pre-judgment interest is without merit" (Doc. # 182 at 4). Although "attorney's fees should not be awarded for the pursuit of any frivolous issues or issues asserted in bad faith," they "may be awarded for work upon issues of fact or law upon which plaintiff ultimately did not prevail so long as they were reasonably calculated to promote the client's interest." *Littlefield v. Deland*, 641 F.2d 729, 733 (10th Cir. 1981). The Court concludes that the Motion for Prejudgment Interest was not frivolous and was filed to further Plaintiff's interests. Although Plaintiff was unsuccessful in his request for prejudgment interest on noneconomic damages, the Court notes that the issue implicates an unsettled question of law in the Tenth Circuit. Further, the Court awarded Plaintiff prejudgment interest on his economic costs. Accordingly, counsel will be compensated for hours spent preparing and litigating that motion.

For the foregoing reasons, the Court determines that Plaintiff is entitled to an award of supplemental attorney's fees for work expended on post-trial motions. The Court reduces the request of $21,467.50 to $20,567.50 to account for a 10% reduction of Mr. Bryant's hours spent on Plaintiff's Response to Defendant's Rule 50 Motion for failure to comply with this Court's practice standards.

Plaintiff is thus entitled to a total of $485,201.50 in reasonable attorney's fees.

## V.      **CONCLUSION**

For the foregoing reasons, it is ORDERED as follows:

- Defendant's Renewed Motion Under Fed. R. Civ. P. 50(b) Or, In the Alternative, Motion for New Trial or Alteration or Amendment of the Judgment Under Fed R. Civ. P. 59 (Doc. # 150) is DENIED;

- Plaintiff's Motion for Prejudgment Interest (Doc. # 151) IS GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to Plaintiff's request for prejudgment interest on $15,000 in compensatory damages for economic costs. It is DENIED in all other respects;

- Plaintiff's Motion for Attorney's Fees (Doc. # 149) is GRANTED IN PART and DENIED IN PART as set forth in this Order. Plaintiff is awarded attorney's fees in the amount of $485,201.50.

- Accordingly, the final judgment shall be amended to include an award to Plaintiff of $2,279.50 in prejudgment interest accrued from May 26, 2017, to March 8, 2022, and attorney's fees in the amount of $485,201.50.

DATED:  July 7, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge